Michael ABRAMS and Sergio Bendixen, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Janet RENO, State Attorney, Eleventh Judicial Circuit Florida, Defendant.

No. 78–1473–CIV–WMH.

United States District Court,
S. D. Florida.

May 10, 1978.

Bruce S. Rogow, Fort Lauderdale, Fla., Flynn Rubio & Tarkoff, Miami, Fla., Jacquelyn E. Steinberg, Fort Lauderdale, Fla., for plaintiffs.

William M. Grodnick, Asst. Atty. Gen., Paul Rashkind, Asst. State's Atty., Richard Jay Weiss, Asst. County Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION

HOEVELER, District Judge.

On April 15, 1978, the first of four "mini-conventions" scheduled by the Dade County Democratic Executive Committee was to take place. Among other things, the conventions, organized on a "grass roots" level were for the purpose of agreeing on endorsements of candidates for uncontested seats in the Legislature from the several districts.

In what was described as considerable haste, Sec. 103.091(6), Florida Statutes (1978) was passed through both houses of the Florida Legislature emerging April 13, 1978.

In the early afternoon of April 14, 1978, the Governor of Florida signed the statute and it became a viable law.

The chronology was not coincidental.

Section 103.091(6), Florida Statutes, provides:

(6) No state executive committee or county executive committee of any political party or any committee established by a state or county executive committee shall endorse or oppose any candidate of its political party seeking nomination in any primary election. Nothing herein shall prohibit an individual member of a state executive committee or an individual member of a county executive committee from independently endorsing or opposing a candidate of his political party seeking nomination in any primary election, provided that such endorsement shall in no way indicate the member's position on, or opposition with, a state or county executive committee.

Section 2. This bill shall take effect upon becoming a law.

The plaintiffs, Michael Abrams and Sergio Bendixen, both members of the Dade County Democratic Executive Committee filed suit in this Court immediately after the statute in question became effective. An emergency hearing was held during the late afternoon of April 14th at which the plaintiffs sought both declaratory and injunctive relief.

Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343(3), 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

The defendant, Janet Reno, as State Attorney, is charged with the enforcement of the criminal laws of the State of Florida within the Eleventh Judicial Circuit (Dade County). As the statute in question is pe-

nal in nature, with violations described as first degree misdemeanors,[1] the State Attorney was properly named. The Attorney General was notified of the hearing to be held on the 14th of April, but declined to appear, apparently on the basis of insufficient notice. Pursuant to later motion and order permitting intervention, the Attorney General is now a party to the action.

After the initial hearing (on April 14th) at which argument was presented by the plaintiffs and defendant, Reno, and at which the testimony of the plaintiff, Abrams, was taken, a preliminary injunction was entered enjoining the enforcement of the Statute and postponing action with reference to the request for declaratory relief until the Attorney General of Florida had the opportunity to defend the constitutionality of the act.

On April 27, 1978, the Court heard additional argument on the issues presented. Counsel for plaintiffs and the Attorney General submitted memoranda prior to argument.

The Court has concluded, first, that this is not a proper situation for abstention and further that the declaratory relief should be granted.

At the time of the hearing on April 14th, no violation of the statute had occurred. As noted above, the legislation was only hours old. However, the "mini-conventions" organized by the Democratic Executive Committee were to begin the following morning. The Attorney General does not suggest that the timing of the statute was coincidental. He argues, that the Court should not consider the haste with which the bill found its way through the legislature. Rather, it is argued, the substantive

validity or invalidity of the act is the proper question. This is true as to the prayer for declaratory relief. It is not as to the need for injunctive relief. The danger of violation and arrest was manifest if the planned endorsement procedures were carried out.

## STANDARD OF REVIEW

■■■■ While § 103.091(6) is initially favored with the presumption of constitutionality, this presumption can be dispelled, if as plaintiffs argue, the statute imposes a substantial burden upon and a significant interference with the plaintiffs' fundamental constitutional rights of speech, assembly and political association. Since the statute penalizes the endorsement of or opposition to any candidate in any primary election and thus imposes a direct prior restraint, there is little doubt that First Amendment values are affected. The legislation is, therefore, subject to strict scrutiny and will only be sustained if the State can show a compelling interest outweighing the plaintiffs competing federally protected rights. Additionally, even if justification can be found in a compelling state interest, the means chosen to advance such interest must be sufficiently narrow so as to constitute the least intrusive alternative available.[2]

## PRINCIPLES OF FEDERALISM

The State of Florida has urged abstention by this Court. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746,. 27 L.Ed.2d 669 (1971).

In *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505, (1974), the Supreme Court approved Federal Declaratory Relief where no state prosecution is pending, but only threatened.[3] The Court in

---

1. F.S. 104.051(2)

2. See the recent case of *First National Bank of Boston v. Bellotti,* —— U.S. ——, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978) where the Supreme Court noted, "where . . . a prohibition is directed at speech itself, and the speech is intimately related to the process of governing, 'the State may prevail only upon showing a subordinating interest which is compelling and the burden is on the government to show the existence of such an interest.' Even then, the

State must employ means 'closely drawn to avoid unnecessary abridgement . . .'" (citations omitted)

3. By stipulation, the State Attorney has admitted that it is her sworn duty to prosecute all violations of criminal statutes in the 11th Judicial Circuit. Further, the State Attorney refused in open court to agree that no prosecution under this statute was appropriate at the present time and in view of the nature of the mini conventions. Thus, the threat of prosecu-

*Steffel* did not directly consider the appropriateness of injunctive relief in cases where no prosecution was pending. However, the Court noted:

"Even the Court of Appeals for the Fifth Circuit [in *Jones v. Wade*, 5th Cir. 1973, 470 F.2d 1176] has limited the scope of the instant decision [*Younger*] by entertaining an action for declaratory and injunctive relief in the absence of a state prosecution where the federal suit attacked the facial validity of a state statute rather than the validity of the statute as applied." *Steffel*, supra at 458 n.8, 94 S.Ct. at 1215.

This case involves the facial validity of the act in question since its enforcement was enjoined prior to the commencement of any prosecution under it.

The *Steffel* case also left open the question of whether a sufficient showing of irreparable injury was made [to justify Federal Injunctive relief] where, although no prosecution was pending, "an individual demonstrates that he will be required to *forgo* constitutionally protected activity in order to avoid arrest." (Supra at p. 463, n.12, 94 S.Ct. at p. 1218).

The apparently brief legislative history of the bill, occurring on the eve of the mini-conventions it was designed to emasculate, made sufficiently clear the danger of violation presented to plaintiffs and the others participating. The timing of the legislation was such that the plaintiffs would have been caused to withdraw on Saturday, April 15th, from engaging in constitutionally protected activities, which, until approximately 1:30 p. m. the preceding day, had been legal and non-criminal. The State takes no serious issue with the Court's impression as to the immediate purpose for the legislation.

The plaintiff, Abrams, testified that the rescheduling of the conventions would result in a loss of over $25,000.00 to the Dade

Democratic Executive Committee. He also testified that it was his intention to individually endorse Democratic Party candidates seeking nominations in primaries and that he intended to indicate his position with the County Executive Committee (Chairman) when making his endorsements. He further testified that unless a determination was made by the Court that the act was unenforceable, he would refrain from making endorsements and would in his capacity as Chairman of the Dade County Democratic Committee, urge delegates to refrain also.[4]

In *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Court held that a Federal plaintiff is not limited to declaratory relief where the threat of repeated future prosecutions was presented by the exercise of the plaintiffs' First Amendment rights. Injunctive relief preventing the further enforcement of a state criminal statute (where the plaintiff had already been subjected to three prosecutions) was approved by the Court. The plaintiff asserted his right to refrain from furthering or promoting the state slogan, with which he disagreed, and which was on his license plate (he repeatedly covered the slogan). The Court sustained his right and importantly (as to the instant case) approved the granting of injunctive relief where the threat of prosecution was real.

In the setting of the circumstances described and the genuine threat to the exercise of free speech and political association, this Court concludes that *Younger* principles do not apply and that it should not abstain.

### THE BURDEN AND THE STATE INTEREST

It seems clear that the act in question imposes a direct prior restraint on the exercise of free speech—the right to endorse or

---

tion was, in the judgment of the Court, real, immediate and genuine and not speculative or imaginary.

**4.** The Court cannot determine whether or not any delegates would have refrained from assembling at the conventions for fear that an

action by the group might invoke individual criminal liability. It is reasonable to surmise, however, that this enactment might have had a "chilling" effect on the delegates' constitutional protected right of assembly.

**1170**

oppose; in sum, in the important right of free political expression. In other terms, a substantial burden on First Amendment rights is presented. The legislation interferes with the internal workings of political parties at the state and local levels. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, the Court stated:

> "the court's decisions in *Mills v. Alabama*, 384 U.S. 214 [86 S.Ct. 1434,] 46 L.Ed.2d 484 . . . and *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, [94 S.Ct. 2831,] 41 L.Ed.2d 730 . . ., held that legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment."

The *Mills* and *Tornillo* cases concern legislative restrictions placed on the media (in *Mills*, the right of a newspaper to endorse on the day of the election). This difference from the instant case is not material in principle. Section 103.091(6) imposes legislative restrictions on the *content* of political speech.

Further, there can be little question that the act is a legislative attempt to regulate the internal affairs of state and county political parties. The justification for this incursion is said to be the state election laws and the regulatory rights incident thereto. Without begging the question of the right of a political executive committee to exist and function without the breath of life provided by the election code, it seems to be bootstrap reasoning to suggest that election code regulation permits the denial of substantial constitutional rights. Corporations are created and exist pursuant to state law. This genesis, however, does not provide the basis for the deprivation of the right of a corporation to speak on a public matter important to the corporation. *First National Bank of Boston v. Bellotti*, —— U.S. ——, 98 S.Ct. 1407, 55 L.Ed.2d 707. In *Bellotti* the Court stated:

> "the press cases emphasize the special and constitutionally recognized role of that institution in informing and educating the public, offering criticism, and providing a forum for discussion and debate [citations omitted]. But the press does not have a monopoly on either the First Amendment or the ability to enlighten"

If we fail to carefully scrutinize legislation facially objectionable; if we permit, in the name of zealous and well intended legislation, the subtle watering down of a complex of rights, we will, in time and perhaps too late, see the damage done by misguided restraint.

■ Even if the apparent impairment of the plaintiffs' interests in free expression resulting from the enforcement of the act does not present a case requiring the strictest constitutional scrutiny, the state should be required "to show a reasonable necessity" for requiring the legislation in question. *Morial v. Judiciary Commission of the State of La.*, 565 F.2d 295 (5th Cir. 1977)

■ In the case of *Ripon Society v. National Republican Party*, 173 U.S.App.D.C. 350, 369, 525 F.2d 567, 586 (1975), the Court of Appeals commenting on the action of the Supreme Court, noted that the Court had ". . . placed the internal workings of a political party squarely within the protection of the First Amendment." Against the framework of these strong First Amendment considerations, the state urges that it has a compelling interest in preserving "official neutrality" of party executive committees in primary elections. Fiscal integrity of the executive committees was also argued to sustain constitutionality. Emotionally appealing words such as "bossism" were suggested but no recommendations were presented as to lesser intrusive methods of achieving the ends apparently sought by the offending legislation. The state's reference to "Hatch Act" cases is not persuasive. The "balancing" presented in connection with such legislation has been found to militate in favor of it. The abuses there are not apparent here. In any event, the state's analogy of placing elected party officials in the same category as officials of the State Department of Administration is without merit. The public expects the latter to conduct the business of government without regard to political considerations. On the other hand, the very business of state and local party officials is politics.

■ The state interests presented by the Attorney General, including the unfortunate timing of the mini-conventions, are both legitimate and important. While the wisdom of some of the other procedures involved, including donations to successful endorsees may be questioned, it is not the court's responsibility or desire to enter into party procedures or to question the wisdom of such procedures unless they bear importantly and decisively on the constitutional issue. It is the opinion of the Court that they do not.

While the act in question does serve the state interests referred to, it does so in an enveloping and "intrusive" manner and to such an extent that its constitutionally objectionable features outweigh the state interests.

The Court does not agree with a proposition that the same interests cannot be advanced by a far more narrowly drawn (and less intrusive) statute.

■ In any event, the Court does not find the asserted interests to be sufficiently compelling to outweigh the plaintiffs' fundamental personal rights of free speech and political association, in view of the substantial burdens which would be imposed on plaintiffs by the statute. The suggestion by the state that no restriction is placed on "individual" speech both misses the mark and presents somewhat of an unintentional absurdity, where a known party executive must, in some way, disclaim his official role.

## CONCLUSION

■ Freedom of speech is a "fundamental personal" right *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). The "checking value" of this right must be emphasized.[5] Historically, it is of interest to note James Madison's original draft formulation of what was to become the First Amendment.

"The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable."[6]

The Court should further note the "equal protection" problems spawned by the distinction drawn between classes of politically active persons. The position of the plaintiff, Bendixen, who is a Democratic National Committeeman, as well as a member of the state and local executive committees underscores the problem. In one capacity, he is inhibited by the act, in another, he is not.

■ In the opinion of the Court, there can be no more important pursuit than the most careful examination of any legislation which seeks to inhibit free political speech and association. Perhaps we are best instructed by the words of Justice Brandeis in *Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095:

"Those who won our independence believed that the final end of the state was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope, and

---

**5.** The Checking Value in First Amendment Theory, Vincent Blasi, American Bar Foundation Journal, Vol. 1977, Summer 3, P. 523.

**6.** Ibid P. 537.

imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

It is the opinion and finding of the Court that Florida Statute 103.091(6) is unconstitutional. A status conference will be set to determine the further procedures to be taken in connection with this litigation.