EU, SECRETARY OF STATE OF CALIFORNIA, ET AL.
*v.* SAN FRANCISCO COUNTY DEMOCRATIC
CENTRAL COMMITTEE ET AL.

No. 87–1269.   Argued December 5, 1988—Decided February 22, 1989

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except REHNQUIST, C. J., who took no part in the consideration or decision of the case. STEVENS, J., filed a concurring opinion, *post*, p. 233.

*Geoffrey L. Graybill, Jr.*, Deputy Attorney General of California, argued the cause for appellants. With him on the briefs were *John K. Van de Kamp*, Attorney General, *Rich-*

*ard D. Martland,* Chief Assistant Attorney General, and *N. Eugene Hill,* Assistant Attorney General.

*James J. Brosnahan* argued the cause for appellees. With him on the brief was *Cedric C. Chao.*\*

JUSTICE MARSHALL delivered the opinion of the Court.

The California Elections Code prohibits the official governing bodies of political parties from endorsing candidates in party primaries. It also dictates the organization and composition of those bodies, limits the term of office of a party chair, and requires that the chair rotate between residents of northern and southern California. The Court of Appeals for the Ninth Circuit held that these provisions violate the free speech and associational rights of political parties and their members guaranteed by the First and Fourteenth Amendments. 826 F. 2d 814 (1987). We noted probable jurisdiction, 485 U. S. 1004 (1988), and now affirm.

## I

## A

The State of California heavily regulates its political parties. Although the laws vary in extent and detail from party to party, certain requirements apply to all "ballot-qualified" parties.[1] The California Elections Code (Code) provides that the "official governing bodies" for such a party are its "state convention," "state central committee," and "county central committees," Cal. Elec. Code Ann. § 11702 (West

---

\**Stuart R. Blatt* filed a brief for the Libertarian National Committee as *amicus curiae.*

[1] A "ballot-qualified" party is eligible to participate in any primary election because: (a) during the last gubernatorial election one of its candidates for state-wide office received two percent of the vote; (b) one percent of the State's voters are registered with the party; or (c) a petition establishing the party has been filed by ten percent of the State's voters. Cal. Elec. Code Ann. § 6430 (West 1977).

In the interest of simplicity, we use the terms "ballot-qualified party" and "political party" interchangeably.

1977), and that these bodies are responsible for conducting the party's campaigns.[2] At the same time, the Code provides that the official governing bodies "shall not endorse, support, or oppose, any candidate for nomination by that party for partisan office in the direct primary election." *Ibid.* It is a misdemeanor for any primary candidate, or a person on her behalf, to claim that she is the officially endorsed candidate of the party. § 29430.

Although the official governing bodies of political parties are barred from issuing endorsements, other groups are not. Political clubs affiliated with a party, labor organizations, political action committees, other politically active associations, and newspapers frequently endorse primary candidates.[3] With the official party organizations silenced by the ban, it has been possible for a candidate with views antithetical to those of her party nevertheless to win its primary.[4]

---

[2] The Code requires the state central committee of each party to conduct campaigns for the party, employ campaign directors, and develop whatever campaign organizations serve the best interests of the party. Cal. Elec. Code Ann. § 8776 (West Supp. 1989) (Democratic Party); § 9276 (Republican Party); § 9688 (American Independent Party); § 9819 (Peace and Freedom Party). The county central committees, in turn, "have charge of the party campaign under general direction of the state central committee." § 8940 (Democratic Party); § 9440 (Republican Party); § 9740 (American Independent Party); § 9850 (Peace and Freedom Party). In addition, they "perform such other duties and services for th[e] political party as seem to be for the benefit of the party." § 8942 (Democratic Party); § 9443 (Republican Party); § 9742 (American Independent Party); § 9852 (Peace and Freedom Party).

[3] For example, while voters cannot learn what the Democratic state and county central committees think of candidates, they may be flooded with endorsements from disparate groups across the State such as the Berkeley Democratic Club, the Muleskinners Democratic Club, and the District 8 Democratic Club. Addendum to Motion to Affirm or to Dismiss 39a ¶ 7 (Addendum) (declaration of Mary King, chair of the Alameda County Democratic Central Committee); Addendum 48 ¶ 7 (declaration of Linda Post, chair of San Francisco County Democratic Central Committee).

[4] In 1980, for example, Tom Metzger won the Democratic Party's nomination for United States House of Representative from the San Diego area,

In addition to restricting the primary activities of the official governing bodies of political parties, California also regulates their internal affairs. Separate statutory provisions dictate the size and composition of the state central committees;[5] set forth rules governing the selection and removal of committee members;[6] fix the maximum term of office for the chair of the state central committee;[7] require that the chair rotate between residents of northern and southern California;[8] specify the time and place of committee meetings;[9] and

---

although he was a Grand Dragon of the Ku Klux Klan and held views antithetical to those of the Democratic Party. Addendum 15a ¶ 2 (declaration of Edmond Costantini, member of the Executive Board of the Democratic state central committee).

[5] For example, the Code dictates the precise mix of elected officials, party nominees, and party activists who are members of the state central committees of the Republican and Democratic Parties as well as who may nominate the various committee members. Cal. Elec. Code Ann. §§ 8660, 8661, 8663 (West 1977 and Supp. 1989) (Democratic Party); §§ 9160–9164 (Republican Party). Other parties are similarly regulated. See § 9640 (American Independent Party); §§ 9762, 9765 (Peace and Freedom Party).

[6] §§ 8663–8667, 8669 (Democratic Party); §§ 9161–9164, 9168, 9170 (Republican Party); §§ 9641–9644, 9648–9650 (West 1977) (American Independent Party); §§ 9790–9794 (West 1977 and Supp. 1989) (Peace and Freedom Party).

[7] The Code limits the term of office of the chair of the state central committee to two years and prohibits successive terms. See § 8774 (West Supp. 1989) (Democratic Party); § 9274 (West 1977) (Republican Party); § 9685 (American Independent Party); § 9816 (West 1977 and Supp. 1989) (Peace and Freedom Party).

[8] § 8774 (West Supp. 1989) (Democratic state central committee); § 9274 (West 1977) (Republican state central committee); § 9816 (West 1977 and Supp. 1989) (Peace and Freedom state central committee).

[9] §§ 8710, 8711 (West Supp. 1989) (Democratic state central committee); §§ 8920, 8921 (West 1977 and Supp. 1989) (Democratic county central committee); § 9210 (West Supp. 1989) (Republican state central committee); §§ 9420–9421 (West 1977 and Supp. 1989) (Republican county central committee); §§ 9730–9732 (American Independent county central committee); § 9800 (West 1977) (Peace and Freedom state central committee); §§ 9830, 9840–9842 (Peace and Freedom county central committee).

limit the dues parties may impose on members.[10]  Violations
of these provisions are criminal offenses punishable by fine
and imprisonment.

## B

Various county central committees of the Democratic and
Republican Parties, the state central committee of the Liber-
tarian Party, members of various state and county central
committees, and other groups and individuals active in parti-
san politics in California brought this action in federal court
against state officials responsible for enforcing the Code
(State or California).[11]  They contended that the ban on pri-
mary endorsements and the restrictions on internal party
governance deprive political parties and their members of the
rights of free speech and free association guaranteed by the
First and Fourteenth Amendments of the United States Con-
stitution.[12]  The first count of the complaint challenged the
ban on endorsements in partisan primary elections; the sec-
ond count challenged the ban on endorsements in nonpartisan
school, county, and municipal elections; and the third count
challenged the provisions that prescribe the composition of
state central committees, the term of office and eligibility cri-
teria for state central committee chairs, the time and place of
state and county central committee meetings, and the dues
county committee members must pay.

---

[10] §§ 8775, 8945 (West 1977 and Supp. 1989) (Democratic Party); § 9275
(Republican Party); §§ 9687, 9745 (West 1977) (American Independent
Party); §§ 9818, 9855 (Peace and Freedom Party).

[11] The plaintiffs sued March Fong Eu, Secretary of State of California;
John K. Van de Kamp, Attorney General of California; Arlo Smith, District
Attorney of San Francisco County; and Leo Himmelsbach, District Attor-
ney of Santa Clara County.

[12] The plaintiffs also asserted that the statutes violated the Equal Protec-
tion Clause of the Fourteenth Amendment.  Because the District Court
held that the statutes violate the First Amendment, it did not reach this
claim.

The plaintiffs moved for summary judgment, in support of which they filed 28 declarations from the chairs of each plaintiff central committee, prominent political scientists, and elected officials from California and other States. The State moved to dismiss and filed a cross-motion for summary judgment supported by one declaration from a former state senator.

The District Court granted summary judgment for the plaintiffs on the first count, ruling that the ban on primary endorsements in §§ 11702 and 29430 violated the First Amendment as applied to the States through the Fourteenth Amendment. The court stayed all proceedings on the second count under the abstention doctrine of *Railroad Comm'n of Texas* v. *Pullman Co.*, 312 U. S. 496 (1941).[13] On the third count, the court ruled that the laws prescribing the composition of state central committees, limiting the committee chairs' terms of office, and designating that the chair rotate between residents of northern and southern California violate the First Amendment.[14] The court denied summary judgment with respect to the statutory provisions establish-

[13] An appeal was then pending in the California Supreme Court presenting a First Amendment challenge to a ban on endorsements by political parties of candidates in nonpartisan school, county, and municipal elections. The California Supreme Court ultimately decided that the Code did not prohibit such endorsements and so did not reach the First Amendment question. *Unger* v. *Superior Court*, 37 Cal. 3d 612, 692 P. 2d 238 (1984). A ban on party endorsements in nonpartisan elections subsequently was enacted by ballot initiative. A Federal District Court has ruled that this ban violates the First and Fourteenth Amendments. *Geary* v. *Renne*, 708 F. Supp. 278 (ND Cal.), stayed, 856 F. 2d 1456 (CA9 1988).

[14] The District Court invalidated the following Code sections: Cal. Elec. Code §§ 8660, 8661, 8663–8667, 8669 (West 1977 and Supp. 1989) (Democratic state central committee); §§ 9160, 9160.5, 9161, 9161.5, 9162–9164 (Republican state central committee); § 9274 (West 1977) (Republican state central committee chair); and § 9816 (West 1977 and Supp. 1989) (Peace and Freedom state central committee chair). In addition, it held that § 29102 (West 1977) was unconstitutional as applied.

ing the time and place of committee meetings and the amount of dues. Civ. No. C–83–5599 MHP (ND Cal., May 3, 1984).

The Court of Appeals for the Ninth Circuit affirmed. 792 F. 2d 802 (1986). This Court vacated that decision, 479 U. S. 1024 (1987), and remanded for further consideration in light of *Tashjian* v. *Republican Party of Connecticut*, 479 U. S. 208 (1986).

After supplemental briefing, the Court of Appeals again affirmed. 826 F. 2d 814 (1987). The court first rejected the State's arguments based on nonjusticiability, lack of standing, Eleventh Amendment immunity, and *Pullman* abstention. 826 F. 2d, at 821–825. Turning to the merits, the court characterized the prohibition on primary endorsements as an "outright ban" on political speech. *Id.*, at 833. "Prohibiting the governing body of a political party from supporting some candidates and opposing others patently infringes both the right of the party to express itself freely and the right of party members to an unrestricted flow of political information." *Id.*, at 835. The court rejected the State's argument that the ban served a compelling state interest in preventing internal party dissension and factionalism: "The government simply has no legitimate interest in protecting political parties from disruptions of their own making." *Id.*, at 834. The court noted, moreover, that the State had not shown that banning primary endorsements protects parties from factionalism. *Ibid.* The court concluded that the ban was not necessary to protect voters from confusion, stating, "California's ban on preprimary endorsements is a form of paternalism that is inconsistent with the First Amendment." *Id.*, at 836.

The Court of Appeals also found that California's regulation of internal party affairs "burdens the parties' right to govern themselves as they think best." *Id.*, at 827. This interference with the parties' and their members' First Amendment rights was not justified by a compelling state interest, for a State has a legitimate interest "in orderly elec-

tions, not orderly parties." *Id.*, at 831. In any event, the court noted, the State had failed to submit "'a shred of evidence,'" *id.*, at 833 (quoting Civ. No. C–83–5599 (ND Cal., May 3, 1984)), that the regulations of party internal affairs helped minimize party factionalism. Accordingly, the court held that the challenged provisions were unconstitutional under the First and Fourteenth Amendments.

## II

A State's broad power to regulate the time, place, and manner of elections "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." *Tashjian* v. *Republican Party of Connecticut*, 479 U. S., at 217. To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments. *Id.*, at 214; *Anderson* v. *Celebrezze*, 460 U. S. 780, 789 (1983). If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, *Tashjian, supra,* at 217, 222; *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 184 (1979); *American Party of Texas* v. *White*, 415 U. S. 767, 780, and n. 11 (1974); *Williams* v. *Rhodes*, 393 U. S. 23, 31 (1968), and is narrowly tailored to serve that interest, *Illinois Bd. of Elections, supra,* at 185; *Kusper* v. *Pontikes*, 414 U. S. 51, 58–59 (1973); *Dunn* v. *Blumstein*, 405 U. S. 330, 343 (1972).

## A

We first consider California's prohibition on primary endorsements by the official governing bodies of political parties. California concedes that its ban implicates the First Amendment, Tr. of Oral Arg. 17, but contends that the burden is "miniscule." *Id.*, at 7. We disagree. The ban directly affects speech which "is at the core of our electoral

process and of the First Amendment freedoms." *Williams* v. *Rhodes, supra,* at 32. We have recognized repeatedly that "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution." *Buckley* v. *Valeo,* 424 U. S. 1, 14 (1976) *(per curiam);* see also *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 913 (1982); *Carey* v. *Brown,* 447 U. S. 455, 467 (1980); *Garrison* v. *Louisiana,* 379 U. S. 64, 74–75 (1964). Indeed, the First Amendment "has its fullest and most urgent application" to speech uttered during a campaign for political office. *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 272 (1971); see also *Mills* v. *Alabama,* 384 U. S. 214, 218 (1966). Free discussion about candidates for public office is no less critical before a primary than before a general election. Cf. *Storer* v. *Brown,* 415 U. S. 724, 735 (1974); *Smith* v. *Allwright,* 321 U. S. 649, 666 (1944); *United States* v. *Classic,* 313 U. S. 299, 314 (1941). In both instances, the "election campaign is a means of disseminating ideas as well as attaining political office." *Illinois Bd. of Elections, supra,* at 186.

California's ban on primary endorsements, however, prevents party governing bodies from stating whether a candidate adheres to the tenets of the party or whether party officials believe that the candidate is qualified for the position sought. This prohibition directly hampers the ability of a party to spread its message and hamstrings voters seeking to inform themselves about the candidates and the campaign issues. See *Tashjian, supra,* at 220–222; *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of California,* 475 U. S. 1, 8 (1986); *Brown* v. *Hartlage,* 456 U. S. 45, 60 (1982); *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 791–792 (1978). A "highly paternalistic approach" limiting what people may hear is generally suspect, *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425

U. S. 748, 770 (1976); see also *First National Bank of Boston, supra,* at 790–792, but it is particularly egregious where the State censors the political speech a political party shares with its members. See *Roberts* v. *United States Jaycees,* 468 U. S. 609, 634 (1984) (O'CONNOR, J., concurring).

Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association. It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments. *Tashjian, supra,* at 214; see also *Elrod* v. *Burns,* 427 U. S. 347, 357 (1976) (plurality opinion). Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, *Tashjian, supra,* at 214 (quoting *Kusper, supra,* at 57), but also that a political party has a right to "'identify the people who constitute the association,'" *Tashjian, supra,* at 214 (quoting *Democratic Party of United States* v. *Wisconsin ex rel. La Follette,* 450 U. S. 107, 122 (1981)); cf. *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–462 (1958), and to select a "standard bearer who best represents the party's ideologies and preferences." *Ripon Society, Inc.* v. *National Republican Party,* 173 U. S. App. D. C. 350, 384, 525 F. 2d 567, 601 (1975) (Tamm, J., concurring in result), cert. denied, 424 U. S. 933 (1976).

Depriving a political party of the power to endorse suffocates this right. The endorsement ban prevents parties from promoting candidates "at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Tashjian, supra,* at 216. Even though individual members of the state central committees and county central committees are free to issue endorsements, imposing limita-

tions "on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association." *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 296 (1981).

Because the ban burdens appellees' rights to free speech and free association, it can only survive constitutional scrutiny if it serves a compelling governmental interest.[15] The

---

[15] California contends that it need not show that its endorsement ban serves a compelling state interest because the political parties have "consented" to it. In support of this claim, California observes that the legislators who could repeal the ban belong to political parties, that the bylaws of some parties prohibit primary endorsements, and that parties continue to participate in state-run primaries.

This argument is fatally flawed in several respects. We have never held that a political party's consent will cure a statute that otherwise violates the First Amendment. Even aside from this fundamental defect, California's consent argument is contradicted by the simple fact that the official governing bodies of various political parties have joined this lawsuit. In addition, the Democratic and Libertarian Parties moved to issue endorsements following the Court of Appeals' invalidation of the endorsement ban.

There are other flaws in the State's argument. Simply because a legislator belongs to a political party does not make her at all times a representative of party interests. In supporting the endorsement ban, an individual legislator may be acting on her understanding of the public good or her interest in reelection. The independence of legislators from their parties is illustrated by the California Legislature's frequent refusal to amend the election laws in accordance with the wishes of political parties. See, *e. g.*, Addendum 12a–13a ¶¶ 7–9 (declaration of Bert Coffey, chair of the Democratic state central committee). Moreover, the State's argument ignores those parties with negligible, if any, representation in the legislature.

That the bylaws of some parties prohibit party primary endorsements also does not prove consent. These parties may have chosen to reflect state election law in their bylaws, rather than permit or require conduct prohibited by law. Nor does the fact that parties continue to participate in the state-run primary process indicate that they favor each regulation imposed upon that process. A decision to participate in state-run primaries more likely reflects a party's determination that ballot participation is more advantageous than the alternatives, that is, supporting independent candidates or conducting write-in campaigns. See *Storer* v. *Brown*, 415

State offers two: stable government and protecting voters from confusion and undue influence.[16] Maintaining a stable political system is, unquestionably, a compelling state interest. See *Storer* v. *Brown*, 415 U. S., at 736. California, however, never adequately explains how banning parties from endorsing or opposing primary candidates advances that interest. There is no showing, for example, that California's political system is any more stable now than it was in 1963, when the legislature enacted the ban. Nor does the State explain what makes the California system so peculiar that it is virtually the only State that has determined that such a ban is necessary.[17]

U. S. 724, 745 (1974); *Anderson* v. *Celebrezze*, 460 U. S. 780, 799, n. 26 (1983).

Finally, the State's focus on the parties' alleged consent ignores the independent First Amendment rights of the parties' members. It is wholly undemonstrated that the members authorized the parties to consent to infringements of members' rights.

[16] The State also claims that the ban on primary endorsements serves a compelling state interest in " 'confining each voter to a single nominating act.' " *Tashjian* v. *Republican Party of Connecticut*, 479 U. S. 208, 225, n. 13 (1986) (quoting *Anderson, supra,* at 802, n. 29). This argument is meritless. It fails to distinguish between a nominating act—the vote cast at the primary election—and speech that may influence that act. The logic of the State's argument not only would support a ban on endorsements by every organization and individual, but also would justify a total ban on all discussion of a candidate's qualifications and political positions. Such a blanket prohibition cannot coexist with the constitutional protection of political speech.

The State's claim that the endorsement ban is necessary to serve any compelling state interest is called into question by its argument before the District Court and the Court of Appeals that this action is not justiciable because the State has never enforced the challenged election laws. 826 F. 2d 814, 821 (1987).

[17] New Jersey also bans primary endorsements by political parties. N. J. Stat. Ann. § 19:34–52 (West 1964); see Weisburd, Candidate-Making and the Constitution: Constitutional Restraints on and Protections of Party Nominating Methods, 57 S. Cal. L. Rev. 213, 271–272, n. 343 (1984). Florida's statutory ban on primary endorsements by political parties was held to violate the First Amendment. See *Abrams* v. *Reno,* 452 F. Supp. 1166,

The only explanation the State offers is that its compelling interest in stable government embraces a similar interest in party stability. Brief for Appellants 47. The State relies heavily on *Storer* v. *Brown, supra,* where we stated that because "splintered parties and unrestrained factionalism may do significant damage to the fabric of government," 415 U. S., at 736, States may regulate elections to ensure that "some sort of order, rather than chaos . . . accompan[ies] the democratic processes," *id.,* at 730. Our decision in *Storer,* however, does not stand for the proposition that a State may enact election laws to mitigate intraparty factionalism during a primary campaign. To the contrary, *Storer* recognized that "contending forces within the party employ the primary campaign and the primary election to finally settle their differences." *Id.,* at 735. A primary is not hostile to intraparty feuds; rather it is an ideal forum in which to resolve them. *Ibid.; American Party of Texas* v. *White,* 415 U. S., at 781. *Tashjian* recognizes precisely this distinction. In that case, we noted that a State may enact laws to "prevent the disruption of the political parties from without" but not, as in this case, laws "to prevent the parties from taking internal steps affecting their own process for the selection of candidates." 479 U. S., at 224.

It is no answer to argue, as does the State, that a party that issues primary endorsements risks intraparty friction which may endanger the party's general election prospects. Presumably a party will be motivated by self-interest and not engage in acts or speech that run counter to its political success. However, even if a ban on endorsements saves a political party from pursuing self-destructive acts, that would

---

1171–1172 (SD Fla. 1978), aff'd, 649 F. 2d 342 (CA5 1981), cert. denied, 455 U. S. 1016 (1982). Several States provide formal procedures for party primary endorsements. See, *e. g.,* Conn. Gen. Stat. § 9–390 (1967 and Supp. 1988); R. I. Gen. Laws § 17–12–4 (1988); see also Advisory Commission on Intergovernmental Relations, The Transformation in American Politics: Implications for Federalism 148 (1986).

not justify a State substituting its judgment for that of the party. See *ibid.; Democratic Party of United States,* 450 U. S., at 124. Because preserving party unity during a primary is not a compelling state interest, we must look elsewhere to justify the challenged law.

The State's second justification for the ban on party endorsements and statements of opposition is that it is necessary to protect primary voters from confusion and undue influence. Certainly the State has a legitimate interest in fostering an informed electorate. *Tashjian, supra,* at 220; *Anderson* v. *Celebrezze,* 460 U. S., at 796; *American Party of Texas* v. *White, supra,* at 782, n. 14; *Bullock* v. *Carter,* 405 U. S. 134, 145 (1972); *Jenness* v. *Fortson,* 403 U. S. 431, 442 (1971). However, " '[a] State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism.' " *Tashjian, supra,* at 221 (quoting *Anderson* v. *Celebrezze, supra,* at 798).[18] While a State may regulate the

---

[18] It is doubtful that the silencing of official party committees, alone among the various groups interested in the outcome of a primary election, is the key to protecting voters from confusion. Indeed, the growing number of endorsements by political organizations using the labels "Democratic" or "Republican" has likely misled voters into believing that the official governing bodies were supporting the candidates.

The State makes no showing, moreover, that voters are unduly influenced by party endorsements. There is no evidence that an endorsement issued by an official party organization carries more weight than one issued by a newspaper or a labor union. In States where parties are permitted to issue primary endorsements, voters may consider the parties' views on the candidates but still exercise independent judgment when casting their vote. For example, in the 1982 New York Democratic gubernatorial contest, Mario Cuomo won the primary over Edward Koch, who had been endorsed by the party. That year gubernatorial candidates endorsed by their parties also lost the primary election to nonendorsed candidates in Massachusetts and Minnesota. Even where the party-endorsed candidate wins the primary, one study has concluded that the party endorsement has little, if any, effect, on the way voters cast their vote. App. 97–98 ¶¶ 10, 14–17 (declaration of Malcolm E. Jewell, Professor of Political Science, University of Kentucky).

flow of information between political associations and their members when necessary to prevent fraud and corruption, see *Buckley* v. *Valeo*, 424 U. S., at 26–27; *Jenness* v. *Fortson, supra,* at 442, there is no evidence that California's ban on party primary endorsements serves that purpose.[19]

Because the ban on primary endorsements by political parties burdens political speech while serving no compelling governmental interest, we hold that §§ 11702 and 29430 violate the First and Fourteenth Amendments.

## B

We turn next to California's restrictions on the organization and composition of official governing bodies, the limits on the term of office for state central committee chair, and the requirement that the chair rotate between residents of northern and southern California. These laws directly implicate the associational rights of political parties and their members. As we noted in *Tashjian,* a political party's "determination . . . of the structure which best allows it to pursue its political goals, is protected by the Constitution." 479 U. S., at 224. Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders. See *Democratic Party of United States, supra* (State cannot dictate process of selecting state delegates to Democratic National Convention);

---

[19] The State suggested at oral argument that the endorsement ban prevents fraud by barring party officials from misrepresenting that they speak for the party. To the extent that the State suggests that only the primary election results can constitute a party endorsement, Tr. of Oral Arg. 8–9, it confuses an endorsement from the official governing bodies that may influence election results with the results themselves. To the extent that the State is claiming that the appellees are not authorized to represent the official party governing bodies and their members, the State simply is reasserting its standing claim, which the District Court rejected. Civ. No. C–83–5599 (ND Cal., June 1, 1984) ("[T]he plaintiff central committees . . . have authorization and capacity to bring and maintain this litigation"). The Court of Appeals did not disturb this ruling, 826 F. 2d, at 822, n. 17; nor do we.

*Cousins* v. *Wigoda*, 419 U. S. 477 (1975) (State cannot dictate who may sit as state delegates to Democratic National Convention); cf. *Tashjian, supra*, at 235–236 (SCALIA, J., dissenting) ("The ability of the members of [a political p]arty to select their own candidate . . . unquestionably implicates an associational freedom").

The laws at issue burden these rights. By requiring parties to establish official governing bodies at the county level, California prevents the political parties from governing themselves with the structure they think best.[20] And by specifying who shall be the members of the parties' official governing bodies, California interferes with the parties' choice of leaders. A party might decide, for example, that it will be more effective if a greater number of its official leaders are local activists rather than Washington-based elected officials. The Code prevents such a change. A party might also decide that the state central committee chair needs more than two years to successfully formulate and implement policy. The Code prevents such an extension of the chair's term of office. A party might find that a resident of northern California would be particularly effective in promoting the party's message and in unifying the party. The Code prevents her from chairing the state central committee unless the preceding chair was from the southern part of the State.

Each restriction thus limits a political party's discretion in how to organize itself, conduct its affairs, and select its leaders. Indeed, the associational rights at stake are much stronger than those we credited in *Tashjian*. There, we found that a party's right to free association embraces a right to allow registered voters who are not party members to vote in the party's primary. Here, party members do not seek to

---

[20] For example, the Libertarian Party was forced to abandon its region-based organization in favor of the statutorily mandated county-based system.

associate with nonparty members, but only with one another in freely choosing their party leaders.[21]

Because the challenged laws burden the associational rights of political parties and their members, the question is whether they serve a compelling state interest. A State indisputably has a compelling interest in preserving the integrity of its election process. *Rosario* v. *Rockefeller,* 410 U. S. 752, 761 (1973). Toward that end, a State may enact laws that interfere with a party's internal affairs when necessary to ensure that elections are fair and honest. *Storer* v. *Brown,* 415 U. S., at 730. For example, a State may impose certain eligibility requirements for voters in the general election even though they limit parties' ability to garner support and members. See, *e. g., Dunn* v. *Blumstein,* 405 U. S., at 343–344 (residence requirement); *Oregon* v. *Mitchell,* 400 U. S. 112, 118 (1970) (age minimum); *Kramer* v. *Union Free School Dist. No. 15,* 395 U. S. 621, 625 (1969) (citizenship requirement). We have also recognized that a State may impose restrictions that promote the integrity of primary elections. See, *e. g., American Party of Texas* v. *White,* 415 U. S., at 779–780 (requirement that major political parties nominate candidates through a primary and that minor parties nominate candidates through conventions); *id.,* at 785–786 (limitation on voters' participation to one primary and bar on voters both voting in a party primary and signing a petition supporting an independent candidate); *Rosario* v. *Rockefeller, supra* (waiting periods before voters may change party registration and participate in another party's primary); *Bullock* v. *Carter,* 405 U. S., at 145 (reasonable filing fees as a condition of placement on the ballot). None of these restrictions, however, involved direct regulation of

---

[21] By regulating the identity of the parties' leaders, the challenged statutes may also color the parties' message and interfere with the parties' decisions as to the best means to promote that message.

a party's leaders.[22] Rather, the infringement on the asso-
ciational rights of the parties and their members was the in-
direct consequence of laws necessary to the successful com-
pletion of a party's external responsibilities in ensuring the
order and fairness of elections.

In the instant case, the State has not shown that its regula-
tion of internal party governance is necessary to the integrity
of the electoral process. Instead, it contends that the chal-
lenged laws serve a compelling "interest in the 'democratic
management of the political party's internal affairs.'" Brief
for Appellants 43 (quoting 415 U. S., at 781, n. 15). This,
however, is not a case where intervention is necessary to pre-
vent the derogation of the civil rights of party adherents.
Cf. *Smith* v. *Allwright*, 321 U. S. 649 (1944). Moreover, as
we have observed, the State has no interest in "protect[ing]
the integrity of the Party against the Party itself." *Tash-
jian*, 479 U. S., at 224. The State further claims that limit-
ing the term of the state central committee chair and requir-
ing that the chair rotate between residents of northern and
southern California helps "prevent regional friction from
reaching a 'critical mass.'" Brief for Appellants 48. How-

---

[22] *Marchioro* v. *Chaney*, 442 U. S. 191 (1979), is not to the contrary.
There we upheld a Washington statute mandating that political parties cre-
ate a state central committee, to which the Democratic Party, not the
State, had assigned significant responsibilities in administering the party,
raising and distributing funds to candidates, conducting campaigns, and
setting party policy. *Id.*, at 198–199. The statute only required that the
state central committee perform certain limited functions such as filling va-
cancies on the party ticket, nominating Presidential electors and delegates
to national conventions, and calling state-wide conventions. The party
members did not claim that these *statutory* requirements imposed imper-
missible burdens on the party or themselves, so we had no occasion to con-
sider whether the challenged law burdened the party's First Amendment
rights, and if so, whether the law served a compelling state interest. *Id.*,
at 197, n. 12. Here, in contrast, it is state law, not a political party's char-
ter, that places the state central committees at a party's helm and, in par-
ticular, assigns the statutorily mandated committee responsibility for con-
ducting the party's campaigns.

ever, a State cannot substitute its judgment for that of the party as to the desirability of a particular internal party structure, any more than it can tell a party that its proposed communication to party members is unwise. *Tashjian, supra,* at 224.

In sum, a State cannot justify regulating a party's internal affairs without showing that such regulation is necessary to ensure an election that is orderly and fair. Because California has made no such showing here, the challenged laws cannot be upheld.[23]

## III

For the reasons stated above, we hold that the challenged California election laws burden the First Amendment rights of political parties and their members without serving a compelling state interest. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

CHIEF JUSTICE REHNQUIST took no part in the consideration or decision of this case.

JUSTICE STEVENS, concurring.

Today the Court relies on its opinion in *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 183–185 (1979)—and, in particular, on a portion of that opinion that I did not join—for its formulation of the governing standards in election cases. In that case JUSTICE BLACKMUN explained his acceptance of the Court's approach in words that precisely express my views about this case. He wrote:

> "Although I join the Court's opinion . . . , I add these comments to record purposefully, and perhaps somewhat belatedly, my unrelieved discomfort with what

---

[23] Because we find that curbing intraparty friction is not a compelling state interest as long as the electoral process remains fair and orderly, we need not address the appellees' contention that the challenged laws weaken rather than strengthen parties.

seems to be a continuing tendency in this Court to use as tests such easy phrases as 'compelling [state] interest' and 'least drastic [or restrictive] means.'  See, *ante*, at 184, 185, and 186.  I have never been able fully to appreciate just what a 'compelling state interest' is.  If it means 'convincingly controlling,' or 'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all.  And, for me, 'least drastic means' is a slippery slope and also the signal of the result the Court has chosen to reach.  A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down.  This is reminiscent of the Court's indulgence, a few decades ago, in substantive due process in the economic area as a means of nullification.

"I feel, therefore, and have always felt, that these phrases are really not very helpful for constitutional analysis.  They are too convenient and result oriented, and I must endeavor to disassociate myself from them. Apart from their use, however, the result the Court reaches here is the correct one.  It is with these reservations that I join the Court's opinion."  *Id.*, at 188–189.

With those same reservations I join the Court's opinion today.