*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
PROGRESS MICHIGAN, COALITION TO CLOSE
LANSING LOOPHOLES, MICHIGANDERS FOR
FAIR AND TRANSPARENT ELECTIONS,

 Plaintiffs-Appellants,

v

SECRETARY OF STATE,

 Defendant-Appellee,

and

DEPARTMENT OF THE ATTORNEY GENERAL,

 Intervening Defendant-Appellee.

FOR PUBLICATION
October 29, 2021

No. 357984
Court of Claims
LC No. 21-000020-MM

---

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
PROGRESS MICHIGAN, COALITION TO CLOSE
LANSING LOOPHOLES, MICHIGANDERS FOR
FAIR AND TRANSPARENT ELECTIONS,

 Plaintiffs-Appellees,

v

SECRETARY OF STATE,

 Defendant-Appellee,

and

DEPARTMENT OF THE ATTORNEY GENERAL,

 Intervening Defendant-Appellant.

No. 357986
Court of Claims
LC No. 21-000020-MM

-1-

Before:  RONAYNE KRAUSE, P.J., K. F. KELLY and CAMERON, JJ.

CAMERON, J. *(concurring).*

I agree with the majority opinion that the 15% geographic restriction for collecting petition signatures and the precirculation affidavit requirement for paid circulators impose unnecessary burdens on the people's rights to initiate laws.  These statutory provisions are therefore unconstitutional.  I further agree with the majority's conclusion that the checkbox requirement is constitutional because it imposes little to no burden on a circulator's exercise of protected speech.  I write separately to examine the checkbox issue and underscore its constitutionality.

The checkbox requirement of 2018 PA 608, as contained in MCL 168.482(7), provides:

> Each petition under this section must provide at the top of the page check boxes and statements printed in 12-point type to clearly indicate whether the circulator of the petition is a paid signature gatherer or a volunteer signature gatherer.

"The freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.  The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v Grant*, 486 US 414, 421; 108 S Ct 1886; 100 L Ed 2d 425 (1988) (quotation marks and citations omitted). "[T]he circulation of [an initiative] petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.' " *Id*. at 421-422.  "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United v Fed Election Comm*, 558 US 310, 340; 130 S Ct 876; 175 L Ed 2d 753 (2010).

I first note that the parties dispute the relevant standard of review.  For the reasons explained below, I conclude that the *Anderson-Burdick* standard applies.  In *Anderson v Celebrezze*, 460 US 780, 789; 103 S Ct 1564; 75 Ed 2d 547 (1983), the United States Supreme Court set forth the following test with regard to states' election laws:

> Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.  Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation.  It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a

-2-

position to decide whether the challenged provision is unconstitutional. [Citations omitted.]

"[W]hen a State election law provision imposes only reasonable, nondiscriminatory restrictions . . ., the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v Takushi*, 504 US 428, 434; 112 S Ct 2059; 119 L Ed 2d 245 (1992) (quotation marks and citations omitted). However, when First and Fourteenth Amendment rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id*. (quotation marks and citation omitted). Importantly, the United States Supreme Court has recognized that, "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id*. at 433.

In sum, *Anderson* and *Burdick* establish a sliding scale of judicial review, ranging from strict scrutiny to rational basis review, depending upon the particular facts and circumstances of each case. Under the *Anderson-Burdick* framework, the "rigorousness of [a court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 US at 434.

In ruling on the competing motions for summary disposition, the Court of Claims agreed with plaintiffs' arguments concerning the unconstitutionality of the checkbox requirement and reasoned that the checkbox requirement burdened a circulator's right to engage in political speech. Specifically, the Court of Claims expressed concern over the timing of the checkbox disclosure, noting that circulators must disclose their paid or volunteer status "at the same time the circulator is delivering his or her political message" and at the moment "when reaction to the circulator's message is immediate and may be the most intense, emotional, and unreasoned" (quotation marks and citation omitted). This observation led the Court of Claims to conclude that the checkbox disclosure "discourages participation in the petition circulation process and inhibits core political speech." In other words, the checkbox disclosure burdens speech because the law will discourage the circulation of petitions because some circulators will no longer "participat[e] in the petition circulation process," therefore resulting in less political speech.

This conclusion hinges on several necessary findings. First, that circulators are genuinely concerned that the "intense, emotional and unreasoned" confrontations that sometimes occur between the public and circulators will be made worse by the disclosure of the circulators' paid or volunteer status. Second, that these confrontations, made more difficult by the checkbox disclosure, will cause some petition circulators to choose to no longer circulate petitions. And third, the natural consequence of checkbox disclosure will be fewer circulators willing to engage in political speech.

While plaintiffs argue on appeal that the Court of Claims properly concluded that the checkbox requirement is unconstitutional, plaintiffs failed to provide any evidence before the Court of Claims to support that political speech would be severely burdened by the checkbox requirement. If the checkbox disclosure is as burdensome as plaintiffs suggest, such evidence should not have been difficult for plaintiffs to produce. For instance, plaintiffs attached to their complaint affidavits from two owners of petition-gathering companies explaining how the 15%

geographical limit would impose severe burdens on the signature-gathering process. However, neither affiant mentioned the checkbox disclosure, let alone how the law would burden their ability to recruit or retain circulators in the future. Nor did plaintiffs offer any opinion evidence explaining why the checkbox disclosure is of such magnitude that some circulators would refuse to circulate petitions. Simply put, there is no evidence in this record to support plaintiffs' speculation, and speculation is insufficient to establish a facial challenge. See *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 568; 566 NW2d 208 (1997).

Rather than provide evidence, plaintiffs' constitutional challenge draws on a comparison between Michigan's checkbox law and a Colorado law held to be unconstitutional in *Buckley v Am Constitutional Law Foundation, Inc*, 525 US 182; 119 S Ct 636; 142 L Ed 2d 599 (1999). But in *Buckley*, the Supreme Court did not analyze whether requiring circulators to disclose whether they were paid or volunteers was unconstitutional. *Id*. at 200. Instead, the *Buckley* Court held that the Colorado statute that required circulators to wear identification badges bearing the circulator's name violated the First Amendment. *Id*. The Court's conclusion was based on evidence that "compelling circulators to wear identification badges inhibits participation in the petitioning process" because of the potential and actual "harassment," "recrimination and retaliation[.]" *Id*. at 197-198. The *Buckley* Court emphasized that "the name badge requirement forces circulators to reveal their identities at the same time they deliver their political message" in an effort "to persuade electors to sign the petition" and that the requirement "operates when reaction to the circulator's message is immediate and may be the most intense, emotional, and unreasoned." *Id*. at 198-199 (quotation marks and citations omitted). Consequently, the *Buckley* Court held that the requirement that the circulators reveal their identity "significantly inhibit[ed] communication with voters about proposed political change, and [was] not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." *Id*. at 192.

There is no indication that disclosure of a circulator's paid or volunteer status increases the risk of harassment to circulators in the same way that a name badge does. In a heated political dispute, it is understandable that the circulators in *Buckley* balked at having to share their personal information with strangers who occasionally have an "intense, emotional and unreasoned" reaction to their political message. But no serious argument can be made that disclosing whether a circulator is paid or a volunteer *increases the risk* of harassment among circulators[1] and that the increased magnitude of hostility will cause some circulators to no longer circulate petitions. Nor is there any reason to believe that the disclosure of one's volunteer or paid status by marking a box on the petition form is a requirement so onerous or troublesome that it will provoke some circulators to disengage from the political process. And unlike a conspicuously worn name badge disclosing one's personal identifying information, the checkbox disclosure is in the same 12-point font found throughout the entire petition form and is unlikely to be seen by a potential signer until *after* the in-person interaction with the circulator has begun. Cf. *Buckley*, 525 US at 198-199

---

[1] Interestingly, plaintiffs do not specifically identify on appeal whether paid or volunteer circulators are met with greater hostility. While plaintiffs appear to suggest that paid circulators will be met with more vitriol than unpaid circulators, there is no evidence in the record to support this.

(noting that "the name badge requirement forces circulators to reveal their identities at the same time they deliver their political message") (quotation marks and citation omitted). Consequently, there is no evidence that the checkbox requirement will impede on the circulator's delivery of his or her political message.

Because there is no reason to believe that the checkbox disclosure will inhibit core political speech, strict scrutiny does not apply. Cf. *Meyer*, 486 US at 420-424 (applying strict scrutiny where a prohibition on paid circulators restricted political expression by restricting the number of people who would carry the sponsor's message).

Moreover, even if the checkbox requirement implicates the First and Fourteenth Amendments to some degree, I would conclude that the requirement serves a reasonable, regulatory interest. It is well settled that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v Twin Cities Area New Party*, 520 US 351, 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997). Additionally, States have "considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley*, 525 US at 191. In this case, the checkbox requirement is a neutral, nondiscriminatory measure because both paid and volunteer circulators are required to disclose their status. The checkbox requirement is designed to ensure transparency and to provide relevant, valuable information to the electors. See *Eu v San Francisco Co Democratic Cen Comm*, 489 US 214, 228; 109 S Ct 1013; 103 L Ed 2d 271 (1989) (holding that "the State has a legitimate interest in fostering an informed electorate").

For these reasons, I agree that the Court of Claims erred when it concluded that the checkbox disclosure requirement is unconstitutional.[2] See *Toll Northville Ltd v Northville Twp*, 480 Mich 6, 11; 743 NW2d 902 (2008) ("Statutes are presumed constitutional unless the unconstitutionality is clearly apparent.").


/s/ Thomas C. Cameron

---

[2] Although the Court of Claims also concluded that the invalidation of voters' signatures on the basis of a circulator's failure to comply with the checkbox requirement was also unconstitutional, plaintiffs do not argue on appeal that this Court should affirm on this basis. Therefore, the issue is abandoned and need not be considered.