[No. C013273. Third Dist. Jan. 19, 1995.]

GREEN PARTY OF CALIFORNIA, Plaintiff and Respondent, v.
BILL JONES, as Secretary of State, etc., Defendant and Appellant.

**COUNSEL**

Anthony L. Miller, Richard S. Nishite and Oliver S. Cox for Defendant and Appellant.

Dickstein & Merin and Mark E. Merin for Plaintiff and Respondent.

**OPINION**

**BLEASE, Acting P. J.**—This is an appeal from the portion of a judgment which grants a peremptory writ of mandate commanding the Secretary of

State[1] to conduct primary elections to select nominees of the Green Party of California (Green Party) in accordance with two rules adopted by officials of the party in lieu of compliance with the procedures specified by the Elections Code.[2]

One rule requires the Secretary of State to close the primary election to candidates for the Green Party nomination for specified offices as directed by an appropriate Green Party governing body (primary closure rule). The other, as modified by the trial court, requires the Secretary of State to include on the Green Party primary election ballot the category "none-of-the-above" and to deny certification to any nominee who receives less votes than are cast for that category (affirmative vote rule).

The appeal has merit and we will modify the judgment accordingly.

### FACTS AND PROCEDURAL BACKGROUND

On January 21, 1992, the Secretary of State notified the temporary chair of the Green Party that by virtue of having obtained the declared affiliation of more than 100,000 registered voters it was qualified, pursuant to section 6430, to participate in the California June 1992 primary election.

On January 25 and 26, 1992, the Green Party conducted a convention in Sacramento and adopted rules to govern primary elections for nominees of the party.[3] On January 28, 1992, the temporary chair of the party sent a copy of the rules to the Secretary of State and requested that the Secretary of State "accept" them in lieu of the procedures mandated by the Elections Code.

The rules include detailed provisions governing the election of members of local party units, called county councils, at primary elections, and governing the conduct of primary elections for the nomination of candidates for partisan office for the general election ballot.

The primary closure rule provides, in pertinent part, that the party convention will decide which, if any, statewide partisan offices the party will contest and the county councils will decide which local partisan offices to contest. Lacking approval, no candidate may submit Green Party nomination papers for the office.

The affirmative vote rule, prior to its modification by the trial court, provides, as to offices approved for a primary contest, that to win the

---

[1]Bill Jones took the position of Secretary of State during the pendency of this appeal. Specific references refer to the former Secretary of State, March Fong Eu.

[2]All undesignated references to a section are to the Elections Code.

[3]This action was taken in a plenary session by a means not clearly shown in the record.

nomination of the party the candidate must receive more votes than any other candidate and more votes than the number of Green Party ballots left blank for that office.

As will appear, the primary closure and affirmative vote rules conflict with the Elections Code provisions for the conduct of primary elections which are applicable to all political parties.

The Secretary of State responded to the proposals of the Green Party by letter dated January 29, 1992. She said that the statutory requirement (§ 9955) that a new party select a means of party nomination from among the existing statutory patterns for party governance is unconstitutional under case law. She also contended that, absent such a selection, she could not implement Green Party procedures that are contrary to or not provided for by existing statutes. She proposed, in default of a selection under section 9955,[4] to advise county election officials not to participate in the conduct of primary election activities to select Green Party county council members. She also proposed to advise local election officials "to comply with the Elections Code provisions permitting qualified members of the Green Party to seek the nominations of their party for all offices on the June 1992 primary election ballot."

This action ensued. Judgment was entered granting the petition for writ of mandate commanding the Secretary of State to conduct elections for Green Party county council members in accordance with the party's rules and to follow party primary closure rules concerning the primary races to be contested. The trial court declined enforcement of the Green Party affirmative vote rule requiring that the candidate garner more votes than the number of ballots left blank. However, it commanded the Secretary of State to add to Green Party primary ballots a choice of "none of the above" and to deny certification to a nominee who receives less votes than are cast for that category.

The Secretary of State appeals from the portion of the judgment imposing the primary closure rule and the none-of-the-above remedy for the affirmative vote rule.

---

[4]Section 9955 is as follows: "Until otherwise provided for by statute, a political party newly qualified pursuant to Section 6430 shall carry on its activities in accordance with procedures applicable to such other political party which has detailed statutory provisions applicable to its operation as shall be designated by the newly qualified party. The temporary officers of the newly qualified political party elected pursuant to Section 9951 shall file notice of such selection with the Secretary of State at least 30 days after the political party qualifies."

## Discussion

### I

### *Introduction*

Two Green Party rules are at issue. The primary closure rule requires the Secretary of State to close the primary election to candidates for the Green Party nomination for offices as directed by a Green Party governing body. The affirmative vote rule, as modified by the trial court, requires the Secretary of State to include on the Green Party primary election ballot the category none-of-the-above and to deny certification as nominee to any person who fails to receive more votes than cast for that category.

These rules conflict with the Elections Code.

It provides that each party "qualified to participate in any primary election" appear on the primary election ballot for each partisan office for which a primary election is to be held. Any qualified member of the party is eligible to seek the nomination of the party for such an office.[5]

■ The Green Party claims that its First and Fourteenth Amendment rights of association bar application of the provisions of the Elections Code which are in conflict with its rules.[6] ■ We measure the validity of the claim by the constitutional standards recently established in *Burdick* v. *Takushi* (1992) 504 U.S. 428 [119 L.Ed.2d 245, 112 S.Ct. 2059]:

"A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate'

---

[5]Section 6430 governs the determination of the parties "qualified to participate in any primary election." Section 6462 directs the Secretary of State to notify each county clerk of "all the [partisan] offices . . . for which candidates are to be nominated at the primary, together with the names of parties qualified to participate in the primary."

Members of the party who meet the qualifications for the office may file nomination documents, declaring their candidacy as a party candidate for the partisan offices to be voted for at the primary election. (§§ 6489-6509.) Such a candidate's name must be printed on the ballot for the primary election. (§ 6658.) The person who receives the most votes at the party primary election is the nominee of the party at the ensuing general election (§ 6610) unless that person is a write-in candidate who receives less than 1 percent of the votes cast for the office at the previous general election (§ 6661, subd. (a)). The name of the nominee "shall be printed upon the ballot for the ensuing general election . . . ." (§ 6659.)

[6]The Green Party belatedly claimed at oral argument that the none-of-the-above remedy can be squared with the Elections Code. The argument comes too late and, in any event, is contrary to the plain words of section 6610, which provides that the *person* who receives the highest number of votes at a primary election is the nominee of the party.

against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

"Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' . . . But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. . . ." (504 U.S. at p. 434 [119 L.Ed.2d at pp. 253-254], citations omitted.)

Pursuant to this standard we determine (1) the nature and magnitude of the claimed associational rights, (2) whether they have been subjected to severe or reasonable, nondiscriminatory restrictions, and (3) whether the restrictions are justified.

## II

### *The Associational Rights*

 We distill from the Green Party's arguments a single cognizable claim of associational right undergirding both the primary closure rule and the affirmative vote rule as modified by the trial court's none-of-the-above remedy.

The party's central argument in support of its primary closure rule is as follows.

"[B]y requiring the Green Party to appear on all primary election ballots, the State impermissibly interferes with the Party's internal affairs by requiring it to funnel resources and energy into races it would prefer to forego. More importantly, however, the Party's mere presence on the ballot at the general election—the necessary result of holding a primary election in which any votes are cast for a candidate (except if the 'none of the above' option is included and wins)—may affect the outcome of a close race between other candidates, creating the opportunity for misuse of the Green Party's ballot status. It could be manipulated into serving a 'spoiler' function. . . .

"Unless the Green Party is able to decide whether or not to contest any particular race, to support a candidate of a major party by not entering a race,

its mere presence could operate contrary to the Green Party's political and ideological interests and could help to elect a candidate whose principles it opposes. Surely no state interest exists to effect this result which is superior to the interests the Party and its members have in *deciding for themselves* whether to field a candidate." (Original italics.)

The associational right to which the primary closure rule is directed is the right of the Green Party to preclude the appearance of a party nominee on the general election ballot against the wishes of a majority of the voting members of the Green Party. This is also the Ariadne's thread which binds the fabric of the Green Party's arguments in favor of the affirmative vote rule as embodied in the trial court's none-of-the-above remedy.

The party makes no direct argument concerning the associational rights affected by its affirmative vote rule. Its argument is cast as support for the beneficial effects of the none-of-the-above remedy.[7] "[I]t permits the Green Party to prevent a rogue candidate who does not represent the principles of the Party from advancing to the general election merely by being either the only candidate in the Green Party primary, or the one who obtains the plurality, however small, of the votes cast; it reduces the likelihood that a 'spoiler' candidacy would be supported by the major parties as a tactic to further their own objectives; it ensures that the election issues will not be framed solely by the candidates and permits an alternative to the 'lesser of evils' situation which dissuades some voters from participating in the process; it ensures that the Green Party candidate will have the support of a substantial segment of the membership."

All of these potential benefits are directed to the claimed right of the Green Party to preclude the appearance of a Green Party nominee on the general election ballot against the wishes of a majority of the members of the

---

[7]The Green Party also asserts that the affirmative vote rule is grounded in a strongly held value in "the decision by consensus principle." The party points to internal decisionmaking procedures for state convention actions which impel consensus through debate and permit actions that are not unanimously supported to be taken only when they garner the support of extraordinary majorities. The party concedes, however, that the affirmative vote rule does not assure that a candidate who advances from the primary to the general election has achieved such a "modified" consensus. Indeed a candidate may lack such a consensus and yet advance, e.g., if the vote is predominantly for candidates split closely between two implacable factions, or a candidate may have such a consensus and be barred, e.g., where most voters split between several candidates any of whom they would support, but an implacable minority outnumbering the supporters of any single candidate declines to vote. Accordingly, we need not puzzle through the conundrum posed by a claim of an associational right to a "modified" consensus decisionmaking procedure. If the decision to nominate a candidate is supported by a majority of party members it is not apparent how "the interests the Party and its members have in *deciding for themselves* whether to field a candidate" are cognizably infringed.

party. As to that claim the justification for the primary closure rule is dependent upon the presence of a none-of-the-above choice on the primary ballot. For that reason we first determine whether the trial court erred in directing the Secretary of State to include this option on Green Party primary election ballots.

## III

### *The None-of-the-above Remedy*

The none-of-the-above remedy interposed by the trial court responds to the Green Party's desire for an affirmative vote rule.[8] It claims that the affirmative vote rule allows the party to prevent a candidate from advancing to the general election "merely by being either the only candidate in the Green Party primary, or the one who obtains the plurality, however so small, of the votes cast . . . ."

A state may compel a political party which seeks ballot access as a political party[9] to nominate its candidates through a primary election process. "It is too plain for argument . . . that the State . . . may insist that intraparty competition be settled before the general election by primary election . . . ." (*American Party of Texas* v. *White* (1974) 415 U.S. 767, 781 [39 L.Ed.2d 744, 760, 94 S.Ct. 1296].) Thus, the question arises: if a state has a primary election scheme which permits a minority of the members of a party to nominate a candidate must the state recognize an affirmative vote rule, as here proffered, to ameliorate that prospect?

### A.

The Green Party's claim of injury to its associational rights— *unwanted* ballot access—is novel; the case law concerns the right to *gain* rather than restrict access to the ballot.[10] (See, e.g., *Storer* v. *Brown, supra,* 415 U.S. 724, a companion case to *American Party of Texas* v. *White, supra,* 415 U.S. 767.)

---

[8] We imply no view on the question of the propriety of fashioning such a remedy in connection with refusing to enforce a party rule. In the interests of judicial economy, and in light of the Green Party's litigating position, we treat the none-of-the-above remedy as if it were a rule adopted by the Green Party.

[9] A political party can avoid the primary process by declining to seek qualified party status. If it does not do so it is free to support and nominate candidates selectively through the independent candidate approach. However, the two "approaches to political activity are entirely different and neither is a satisfactory substitute for the other." (*Storer* v. *Brown* (1974) 415 U.S. 724, 745 [39 L.Ed.2d 714, 732, 94 S.Ct. 1274].)

[10] In the obverse situation, where the party desires that a candidate who has ballot access be permitted to use its name on the ballot, two precedents are called to our attention. In *Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 542 [170 Cal.Rptr. 25, 620 P.2d 612], the

The Green Party principally relies on *Eu* v. *San Francisco Democratic Comm.* (1989) 489 U.S. 214 [103 L.Ed.2d 271, 109 S.Ct. 1013].[11] In that case the Supreme Court struck down several statutes as "regulating a party's *internal* affairs without showing that such regulation is necessary to ensure an election that is orderly and fair." (*Id.* at p. 233 [103 L.Ed.2d at p. 288], italics added.) It invalidated a statute which banned endorsements of candidates in primary elections by party central committees, holding that the statute burdened political speech while serving no compelling governmental interest. (*Id.* at p. 229 [103 L.Ed.2d at p. 286].) It similarly invalidated statutes which specified the form of the governing bodies at the county level and which prevented the "parties from governing themselves with the structure they think best." (*Id.* at p. 230 [103 L.Ed.2d at p. 286].) It also struck down statutes which directed that public officeholders automatically have membership on party official bodies as an interference "with the parties' choice of leaders." (*Ibid.* [103 L.Ed.2d at p. 287].) The court struck other statutes imposing term limits on the chair of the party state central committee and requiring rotation of the chair between residents of northern and southern California on the ground they limit party discretion in the conduct of its affairs. (*Ibid.*)

The statutes at issue here, in specifying a primary nominating process at odds with the rules proffered by the Green Party, manifestly affect the party's internal affairs. (See *American Party of Texas* v. *White, supra,* 415 U.S. at p. 783, fn. 15 [39 L.Ed.2d at p. 761].) They permit a minority of party members to place a nominee of the party on the general election ballot.

The Elections Code provides that a candidate may be placed on the primary election ballot by filing a declaration of candidacy signed by a

California Supreme Court declared that identifying a candidate as "Independent" on the ballot rather than as affiliated with a party that had not yet qualified to participate in primary elections "imposes an insubstantial burden on the rights to associate and to vote . . . ." In *Lightfoot* v. *Eu* (9th Cir. 1992) 964 F.2d 865, the Libertarian Party had adopted a rule that to be their nominee a write-in candidate needed only enough votes in the primary to satisfy the signature endorsement requirements to have appeared on the primary ballot in the first place. The court upheld the conflicting rule of section 6661, subdivision (a), which, as related, requires that a write-in candidate at a primary election receive one percent of votes cast at the last election in order to be placed on the general ballot as the nominee of a party. It found the burden placed on associational rights by denial of use of the party's name "slight."

[11]The immediate precursor of *Eu* v. *San Francisco Democratic Comm.* is *Tashjian* v. *Republican Party of Connecticut* (1986) 479 U.S. 208 [93 L.Ed.2d 514, 107 S.Ct. 544]. In *Tashjian* the Republican Party of the State of Connecticut had adopted a rule permitting voters who were not affiliated with any party to vote in Republican primary elections. The Secretary of State of Connecticut refused to follow the party rule because a state statute limited participation in party primary elections to voters who had registered as members of the party. The party challenged the statute and the Supreme Court upheld the judgment in favor of the party.

number of party members which varies between one and sixty five, depending upon the office and party registration. (§ 6495.) "The person who receives the highest number of votes at a primary election as the candidate of a political party for the nomination to an office is the nominee of that party at the ensuing general election." (§ 6610.)[12] If a Green Party member files nominating papers there will be a nominee "of" the Green Party at the ensuing general election regardless whether the majority of members of the party are opposed to having a nominee.

Placement on the general election ballot confers an obvious advantage in garnering votes. When this advantage is conferred on a nominee "of" a party over the opposition of a majority of that party there is an impairment of an associational interest. The presence of the person on the ballot suggests that the party endorses or approves the candidacy. Notwithstanding that this suggestion is dispelled by the Elections Code, this knowledge is esoteric and, as a practical consequence of qualifying to participate in primary elections, the party may be compelled to lend its imprimatur at the behest of a minority of party members.

Despite the unusual nature of the Green Party claim to have been injured in its associational interests when a minority of the party obtains ballot access, we find it plausible. In *Eu* v. *San Francisco Democratic Comm.*, *supra*, the Supreme Court observed that "[b]y regulating the identity of the parties' leaders, the challenged statutes may also color the parties' message and interfere with the parties' decisions as to the best means to promote that message." (489 U.S. at p. 231, fn. 21 [103 L.Ed.2d at p. 287].) This parallels the argument of the Green Party that control over its name for ballot access is important to the goal of ensuring that its standard bearers represent its ideologies and preferences and that its message is not blurred.

In *Eu* v. *San Francisco Democratic Comm.*, *supra*, the Supreme Court included in its enumeration of associational rights the right "to select a 'standard bearer who best represents the party's ideologies and preferences.' " (489 U.S. at p. 224 [103 L.Ed.2d at p. 283], quoting from *Ripon Society* v. *National Republican Party* (D.C. Cir. 1975) 525 F.2d 567, 601 [173 App.D.C. 350] (en banc) (Tamm, J., conc. in result).) If one bears the party standard against the discernible wishes of a majority of the party, the right of selection is affected.

We conclude that the unauthorized use of the name of a party cognizably affects associational interests of the kind protected by the First and Fourteenth Amendments to the United States Constitution.

---

[12]There is an exception where the person who receives the highest number of votes is a write-in candidate. As related, such a nominee must also receive votes equal in number to 1 percent of all votes cast for the office at the last pertinent general election. (§ 6661, subd. (a).)

## B.

This conclusion does not end the analysis. To identify a cognizable injury to an associational interest does not confer an associational right nor warrant the acceptance of *any* rule which the party claims ameliorates the injury. Regardless of the severity of the injury, the warrant is no stronger than its capacity to cure the injury.

The Green Party's affirmative vote rule, even as modified by the none-of-the-above remedy, would function haphazardly as a cure for the access to the ballot which the Elections Code may confer upon a minority of the party. This gravely undercuts the party's claim of right to that rule.

The first defect of the affirmative vote rule is that a voter may fail to vote for a candidate for reasons which do not bear on majoritarian control. A voter may fail to select between candidates out of the belief that the winner, whoever that may be, should become the party standard bearer. For this reason the affirmative vote rule may disserve the associational interest in majoritarian control depending upon the happenstance of the relative numbers who do and do not vote and the sentiments of those who choose not to vote.

This defect is palliated by the none-of-the-above remedy broached by the trial court. A voter who selects none-of-the-above has expressed the desire that none of the candidates whose names appear on the primary election ballot go forward as the standard bearer on the general election ballot. Nonetheless, the remedy does not account for the wishes of those who decline to vote for any category and, if the winner is a write-in candidate, a vote for "none of the above" is equivocal. A permissible inference to be drawn concerning the wishes of a voter who declines to vote, necessarily also declining to vote for "none of the above," is that "any of the above" is an acceptable nominee.

More importantly, the none-of-the-above remedy does not overcome another defect of the affirmative vote rule; it does not account for the wishes of the supporters of unsuccessful candidates in multiple candidate primaries. Those who support a losing candidate may well desire that, if their candidate does not prevail, the most successful candidate should be the party standard bearer in the general election.

Notwithstanding the sentiments of a majority of party members, even an extraordinary majority, under the affirmative vote rule a plurality bloc which chose "none of the above" would prevail over those sentiments. These

defects render the affirmative vote rule and the derivative none-of-the-above remedy an electoral affectation.

## C.

We must next examine " 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights . . . .' "

The Secretary of State suggests the state has an interest in the uniformity of ballot procedures in order to prevent voter confusion and to minimize administrative burdens occasioned by idiosyncratic party procedures. Although the potential for confusion and the marginal administrative burden of the none-of-the-above remedy do not appear great, neither can we say they are insignificant. Even little variations, if they are capable of multiplication at the behest of political parties contain the seeds of an elections procedure Babel.

## D.

The final inquiry required by *Burdick* v. *Takushi* is that we determine "the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." (504 U.S. at p. 434 [119 L.Ed.2d at p. 253].)

As we have explained, the affirmative vote rule and the derivative none-of-the-above remedy provide at best an uncertain and fitful remedy for the claimed injury of potential minority control of access to the party's ballot. For this reason the associational interests of the Green Party are not subjected to severe restrictions by the state's election statutes.

The regulations are nondiscriminatory. The question is whether they are reasonable in light of the burden imposed upon the Green Party's associational interests. As we noted, that burden is not great. The reasonableness of the burden must be viewed in that light.

As noted, *Burdick* v. *Takushi, supra*, 504 U.S. at p. 434 [119 L.Ed.2d at pp. 253-254], holds that " 'the State's important regulatory interests are generally sufficient to justify' [reasonable, nondiscriminatory restrictions] . . ." "upon the First and Fourteenth Amendment rights of voters . . . ." That is the case here.

We conclude that " 'the State's important regulatory interests are . . . sufficient to justify' the restrictions."

## IV

### *The Primary Closure Rule*

The Green Party primary closure rule is also grounded on an interest in avoiding minority use of the Green Party name and ballot access against the wishes of a majority of party members. The rules assign to party governing bodies the authority to decide not to conduct a primary election for particular offices. The choice is determined by representatives of the party membership rather than by direct election of the members.

The question is whether the state must accept such a delegation of authority as a cure for the potential injury that a Green Party nominee may appear on the general election ballot against the wishes of a majority of the membership. We think not.

### A.

As with the affirmative vote rule, the proposed cure does not necessarily redress the claimed injury for the reason that the decision of the governing bodies may not correspond with the sentiments of a majority of the party members. Governing bodies are more or less representative of the membership depending upon a myriad of factors, including the method of their selection and tenure, the procedural rules governing their decisionmaking,[13] and current factional politics within the party.

Ordinarily one would expect some correlation between the determinations of party governing bodies and the sentiments of a majority of members of a party. However, there may be an inverse correlation and, in any event, the degree of correlation will vary widely depending upon the play of particular factors.

---

[13]For example, it is uncertain on this record whether the respective governing bodies must act to close or to open a primary. This is a point of some moment, since the act in question may require consensus or an extraordinary majority vote on the part of the governing body under rules that have been or may be adopted by them. Even assuming a perfectly representative governing body, whichever action requires such a consensus or extraordinary majority vote affords a tactical opportunity for a minority faction within the membership to control the use of the party name and ballot access. This occurs whenever a minority has control either to permit such use and access, or to deny it.

## B.

The countervailing interests of the state include an interest in the uniformity of ballot procedures to prevent voter confusion and to minimize administrative burdens occasioned by idiosyncratic party procedures.

The Secretary of State suggests that the state has an affirmative interest in avoiding control of the party's ballot access by party governing bodies. The Secretary of State notes the historical controversy concerning nominations by party conventions which led to the present system of direct primaries. It is argued that, in light of this history, the state may decline to assign even the limited control over the ballot here in issue in order to forestall the possibility of electoral manipulation by special interests who may more easily dominate party bodies than an open public electoral process.

As related, various deleterious consequences are asserted by the Green Party to its interests and to the public interest that may be attributable to manipulation of its ballot access by minority factions within the party. Assigning the power to open or close primaries to party governing bodies does not ensure these deleterious consequences will not occur; it simply moves the pressure point from one place on the electoral anatomy to another.

The power to close primaries seems a relatively innocuous one. However, one can imagine its employment in a pernicious manner, e.g., elites of multiple competitive parties with primary closing rules could cooperate to avoid the uncertainty of electoral contests, by trading reciprocal closures.

Weighing the countervailing interests, we conclude the Secretary of State has the more persuasive claim. The injury which the primary closure rules address does not strongly implicate the associational interests of the Green Party and the proffered cure is problematic.

The state's election statutes do not subject First and Fourteenth Amendment associational interests to " 'severe' restrictions" within the formulation of *Burdick* v. *Takushi*. The restrictions of the Elections Code "impose[] only 'reasonable, nondiscriminatory restrictions' " on those interests.

### DISPOSITION

The judgment and the ensuing peremptory writ of mandate are modified to strike the provisions compelling the Secretary of State to abide by the Green

Party primary closure rules and the choice of none-of-the-above remedy. As so modified the judgment is affirmed. The parties shall bear their own costs on appeal.

Davis, J., and Nicholson, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 13, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.