872 A.2d 1092 (2005)
377 N.J. Super. 339
Bret SCHUNDLER, Diane Sank, and Bret2005, Plaintiffs-Appellants,
v.
Kathleen DONOVAN, Bergen County Clerk Defendant-Respondent.
Bret Schundler, Richard Bradford, and Bret2005, Plaintiffs-Appellants,
v.
James Hogan, Gloucester County Clerk Defendant-Respondent.
Forrester for Governor, Inc., and Douglas Forrester, Individually, Plaintiffs-Appellants,
v.
Kathleen Donovan, Clerk of the County of Bergen, Peter Harvey, Attorney General, State of New Jersey, Todd Caliguire, Paul DiGaetano, Steve Lonegan, John Murphy, and Robert Schroeder, Defendants-Respondents, and
Brett Schundler, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 3, 2005.
Decided May 5, 2005.
*1093 Maciag Law, Howes & Howes, Raritan and Barry McTiernan & Moore, Jersey City, attorneys for appellant-respondent/cross-appellant Schundler, and appellants Bradford, Bret2005 and Sank (Thaddeus R. Maciag, Sommerville, W. Timothy Howes, Raritan and Sean M. Connelly, of counsel and on the joint brief).
Graham, Curtin & Sheridan, Morristown, attorneys for appellants Forrester for Governor, Inc. and Forrester individually (Peter G. Sheridan, of counsel and on the brief).
Carbone and Faasse, attorneys for respondents Donovan and Hogan (John M. Carbone, Hackensack, on the letter brief).
Piro, Zinna, Cifelli, Paris & Genitempo, attorneys for respondent DiGaetano (Ernest P. Fronzuto, Nutley, on the brief).
Steven S. Polinsky, East Brunswick, attorney for respondent Lonegan.
Edwards & Caldwell, Hawthorne, attorneys for respondent Murphy (Douglas F. Doyle and John A. Stone, on the brief).
Before Judges KESTIN and LEFELT.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
On May 3, 2005, acting upon emergent applications for summary disposition of these appeals involving ballot placement in the June 7, 2005 Republican primary, we entered an order vacating the trial court's order dismissing the complaints. Our order required the county clerks involved to redraw for ballot positions. The order stated:
In the circumstances presented, given the practical limitations of space on a ballot of fixed dimensions as described by the trial court in its written decision of May 2, 2005; and, having considered the arguments advanced by the parties in the light of prevailing rules of law as established by statute, N.J.S.A. 19:23-26.1, and in the judicial opinions cited by the trial court; we ORDER that the Bergen County Clerk and the Gloucester County Clerk redraw for ballot positions in the 2005 Republican primary for governor based on two principles: first and foremost, treating all candidates for governor equally in respect of potential ballot placement; and, second, but only to the extent practicable within the confines of the first principle, accommodating the choices of any candidates for any office in the primary who have expressed timely preferences regarding bracketing.
The procedural background and pertinent facts in these consolidated cases were well-framed by the trial court in its comprehensive opinion; and the spatial limitations facing the county clerks in this primary were fully described. The full text of that opinion follows:
These three matterstwo involving the Bergen County Clerk and one involving the Gloucester County Clerk have been consolidated for disposition and are being regarded as a summary-type proceeding. In accordance with *1094 the provisions set forth in N.J.S.A. 19:13-12 the "[j]udge performs his duty as legislative agent in a summary way, but the power granted is not one which the court is required to exercise in every case, and relief which may be justified in given cases between candidates, or between candidates and public officials, may be granted only partly, or denied altogether, when private interests of candidate[s] conflict with overriding public consideration." Murray v. Murray, 7 N.J.Super. 549, 72 A.2d 421 (Law Div.1950). The plaintiffs herein are candidates who seek the Republican Party's nomination in the June election for the respective offices sought. They are: Bret Schundler ("Schundler") for Governor; Douglas Forrester ("Forrester") for Governor; Diane Sank ("Sank") for Freeholder (Bergen County); and Richard Bradford ("Bradford") for Freeholder (Gloucester County). The named defendants are Kathleen Donovan ("Clerk Donovan"), the Bergen County Clerk, and James Hogan ("Clerk Hogan"), the Gloucester County Clerk.
These are common claims involving actions of the clerks respecting the ballot for the June 7 Republican primary election. They assert that the clerks have made erroneous decisions respecting the positioning of various candidates on the ballot. They seek an order of the court that would compel the clerks to have a new drawing for the ballot positions.
The process by which the clerks set up the ballot for the Republican primary election was this: There are seven candidates for the nomination for Governor. Of these, two candidates (Lonegan and DiGaetano) were determined to be "bracketed" with slates of candidates for other offices (freeholder, etc.), and five were viewed as "unbracketed." Schundler was running under the slogan "Bret2005" and had authorized a single candidate running in the two-person freeholder race to use the same slogan; the clerks determined other requirements of the bracketing statute had not been met. And so the Schundler candidacy was deemed "unbracketed" as well.
There were two drawings, one first for the full-slate candidacies of Lonegan and DiGaetano, and a second for the other five candidates. Lonegan drew the first spot in the first draw. In the second draw, the finish was Forrester, Murphy, Schroeder, Schundler, and Caliguire.
The Schundler complaint is that the clerks were overly technical about compliance with the statutory requirements regarding "bracketing" of the non-gubernatorial candidates with the gubernatorial candidate that they say can and should be corrected by court order after the fact.
The Forrester claim is that there ought not be a distinction between bracketed and non-bracketed candidates, since adherence to the two-tier drawing results in the non-bracketed candidates being excluded from having an opportunity to draw for the first slot or column on the ballot and thus is discriminatory.
The drawing occurred April 21 and these applications were filed within a few days of the drawing. At a court session last Wednesday, April 27, to address the setting of a protocol for the resolution of these matters, all counsel appeared and acquiesced in the court's schedule for submissions, responsive papers being submitted by the end of the day on April 28, and reply papers by the end of April 29. The court indicated it would rule on the matters May 2.
It is important to proceed as expeditiously as possible inasmuch as deadlines for the preparation of the machines and *1095 the printing of ballots are upon us right now, in view of the pending primary election of June 7. Absentee ballots must be mailed out promptly in accordance with statutory timelines.
Analysis
The position [of the candidates and bracketed groups on the primary-election ballots] shall be determined by the county clerks. N.J.S.A. 19:23-24. The clerk has the responsibility to deal with petitions for the elections and to set up the ballot arrangements and array. Quaremba v. Allan, 128 N.J.Super. 570, 321 A.2d 266 (App.Div.1974). Unless specifically directed by statute as to a procedure, the clerk has discretion in carrying out this responsibility. Ibid. See also, Tomasin v. Quinn, 150 N.J.Super. 593, 597-599, 376 A.2d 233 (Law Div.1977); Richardson v. Caputo, 46 N.J. 3, 214 A.2d 385 (1965); Sooy v. Gill, 340 N.J.Super. 401, 774 A.2d 635 (App.Div.2001).
The specifics as to the ballot array in counties using voting machines (as here) are set out in N.J.S.A. 19:49-2. Joint petitions with the same slogan, to whom can be joined by request a State-filed candidate, can request the same "line" on the voting machine or ballot. In other words, a candidate for Governor (or for Senate) can request to be allied with a group of candidates for other offices (freeholder, Assembly) that have themselves "bracketed" together to run under the same slogan.
These allied or bracketed groups of county candidates can draw for position. The "State" candidates are entitled to a drawing for position as among themselves, but not as against those affiliated with the county candidates. Moskowitz v. Grogan, 101 N.J.Super. [111]114[243 A.2d 280] (App.Div.1968). Thus, the distinction as has been drawn by the county clerks in the two-tiered drawings first of allied slates and thereafter of State candidates running without allied slates in the county.
Where the clerk's discretion is exercised to further a goal of the election laws, the court will not substitute its judgment for that of the clerk. The court looks to see that the clerk's action in exercise of that discretion is "rooted in reason." Sooy v. Gill, supra, at 414, 774 A.2d 635; Richardson v. Caputo, supra; Quaremba v. Allan, supra.

The actions of the clerks under review here cannot be shown to have been arbitrary exercises of discretion. The rationale for their courses of action can be discerned from the facts they faced in taking these actions. Their actions I conclude are based on a logical analysis of the situations with which they were presented.
The statutes governing the arrangement of the names on the ballot use the terms "lines" and "columns." Generally, the ballot can be viewed as a grid of rectangular boxes running horizontally from left to right (these are called "lines") and vertically from top to bottom (these are called "columns"). The setup used here is for the various offices to be voted on to be arrayed vertically in one column and for the candidates for the respective offices to be set out horizontally in a line alongside the office. If there were fewer offices to be filled and a greater number of candidates for those offices, it might be as sensible to arrange the ballot in the opposite array, i.e., the offices horizontally and the candidates vertically. Thus, the terms in the statutes of lines and columns can be regarded as interchangeable depending on the ballot arrangement. In this context then the provisions of N.J.S.A. 19:23-26.1 (prohibition against nominees to offices other than Governor/Senator from appearing in the same column or *1096 horizontal row as the gubernatorial/senatorial candidate) are not inconsistent with the arrangement of this ballot.
Inspection of the Bergen County official primary election ballot will show the physical limitations of the ballot that the Bergen County Clerk faced when confronted with the situation before her. Starting at the left side, there is a column reserved for write-in selections. The next column shows the offices for which the candidates are running. To the right of that column, there are only five columns available for the names of those running for the office. Since there are seven candidates running for Governor, these candidates cannot have a separate column each, for the physical limitations simply do not permit. The solution given by the county clerk is for the fifth, sixth, and seventh candidates drawn to share the fifth and last column, with the space for their names three "boxes" wide and for these names to appear vertically. In addition to these gubernatorial candidates, the clerk had to deal with the two "slates" of non-State candidates, one non-State candidate affiliated with a gubernatorial candidate (Schundler) but not considered a "group," and a candidate for freeholder not affiliated with anyone.
To achieve the ideal allocation and to accommodate all slates, affiliations, and non-affiliated candidates, one would need at least eight columns. But as I noted, there are but five columns available. Thus the array of candidates for governor in the arrangement noted above.
Here, if the clerk had drawn but one time and placed the non-State slates under the name of the affiliated gubernatorial candidate, there is a strong possibility that one or both of these affiliated slates would have wound up in the fifth column, running under an affiliated gubernatorial candidate and under non-affiliated candidates. Where to put other non-State candidates under that scenario? There is no ideal solution, much less one that is mandated. There are a number of possible arrangements. The solution or arrangement chosen by the county clerk appears to be "rooted in reason." Sooy v. Gill, supra, Richardson v. Caputo, supra; Quaremba v. Allan, supra.

The court will not substitute its judgment for that of the clerk merely because it perceives that another arrangement might have been chosen, or even that the court prefers another. Murray v. Murray, 7 N.J.Super. 549, 72 A.2d 421 (Law Div.1950).
As to the Schundler claim that the clerk improperly disregarded the bracketing of Schundler as gubernatorial candidate with the solitary freeholder candidate in the two counties, again the clerk exercised discretion appropriately and not arbitrarily by concluding that the requisite procedures had not been complied with. The plaintiffs admit that they have not met the requirements of N.J.S.A. 19:49-2. The court cannot ignore the plain meaning of the statute and impose on the county clerks of this State an obligation to look beyond the filings of candidates for office to ascertain their true intentions. Rather, the court must adhere to the plain meaning of the statute where its meaning is clear and unambiguous. State v. Reldan, 373 N.J.Super. 396, 861 A.2d 860 (App.Div. 2004); Chase Manhattan Bank v. Josephson, 135 N.J. 209, 638 A.2d 1301 (1994). Thus, "absent any specific indication of legislative intent to the contrary" the court should not read into the statute language that is simply is not there. Id.; (see also Town of Morristown v. Woman's Club, 124 N.J. 605, 592 A.2d 216 (1991)). Indeed the requisites *1097 of the statute were not met. Even though that deficiency might be correctable after the fact, nonetheless to do so at this late date would be disruptive of the process when faced with the tight time constraints.
In any event, the sense of N.J.S.A. 19:49-2 contemplates an association between the State candidate (for Governor, in this case) and candidates filing a joint petition with the same designation or slogan, that is, of a group. The declaration of a solitary person in the context of several offices to be filled hardly qualifies as a "joint petition." The use by a solitary candidate for non-State office, where there are several offices to be filled, of a slogan being used by a gubernatorial candidate does not qualify their affiliation as a "slate" to position them in the first-tier drawing convention used by the clerk. This is merely a device to achieve more favorable ballot position and not a bona fide affiliation between a gubernatorial candidate and joint petitioners to form a "unit" to run under the same banner.
In conclusion, then, even if the court were to order a new drawing, there is no assurance the clerk's decision with regard to the then results and the arrangement on the "new ballot" that the clerk would determine, with so many variables and with the physical limitations of the ballot, that the new arrangement would itself lie in repose.
In sum, ballot position resulting from the clerk's adoption of certain conventions and selection of a drawing process that the clerk perceives to achieve the fairness and integrity of the voting process will not be disturbed in the absence of clear violation of applicable statutes or unreasonable exercise of discretion. The court does not view either as having occurred here. Therefore the actions of the county clerks in setting out the arrangement on the Republican primary election ballot will not be disturbed.
We respect and share the trial court's reticence to substitute its judgment for the considered choices made by the county clerks. We, too, respect the county clerks' expertise in ballot design and placement. That expertise, however, must be applied in accordance with standards established by the Legislature.
N.J.S.A. 19:23-26.1 was enacted in 1981 to provide:
In the case of a primary election for the nomination of a candidate for the office of United States Senator and in the case of a primary election for the nomination of a candidate for the office of Governor, the names of all candidates for the office of United States Senator or Governor shall be printed on the official primary ballot in the first column or horizontal row designated for the party of those candidates.
* * * * * *
No candidate for nomination for any other office shall have his name printed in the same column or horizontal row as the candidates for nomination for the office of United States Senator or Governor.
This enactment superseded all earlier inconsistent provisions, including pre-existing judicial determinations to the extent they could be deemed to be at variance with the clear purport of the statute. See, e.g., Moskowitz v. Grogan, 101 N.J.Super. 111, 243 A.2d 280 (App.Div.1968) (authorizing separate ballot placement for unaffiliated State office candidates, on the one *1098 hand; and State office candidates affiliated with local candidates, on the other hand).
Subsequently, a trial court in Lautenberg v. Kelly, 280 N.J.Super. 76, 654 A.2d 510 (Law Div.1994), declared N.J.S.A. 19:23-26.1 unconstitutional. That determination was based upon the Law Division's understanding of the United States Supreme Court's opinion in Eu v. San Francisco County Democratic Central Comm., 489 U.S. 214, 109 S.Ct. 1013, 103 L. Ed.2d 271 (1989), and state court precedent, see Harrison v. Jones, 44 N.J.Super. 456, 461, 130 A.2d 887 (App.Div.1957). The court in Lautenberg understood the statute to violate the constitutional imperatives protecting free speech and associational rights.
The record in this matter discloses a March 19, 1997 opinion from the New Jersey Attorney General taking the same position and advising the Department of State "that the provisions of N.J.S.A. 19:23-26.1 should no longer be enforced for any primary election for the office of United States Senator or Governor."
The statute still exists, however. It has not been repealed. We are not bound by either the Law Division's holding or the Attorney General's opinion. We are obliged to interpret the statute by our own best lights. With respectful regard for the reasoning of the Law Division in Lautenberg and the Attorney General thereafter, we consider the conclusions of generalized unconstitutionality they reached to be insupportable in the context of the unusual circumstances before us.
It is important always, as a first principle of judicial analysis, to respect the Legislature's public policy choices unless they are negated by constitutional standards. Our beginning point here, therefore, is the obvious choice for ballot placement equality that undergirds N.J.S.A. 19:23-26.1.
No rights guaranteed by the First Amendment are absolute. See, e.g., Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217-18, 107 S.Ct. 544, 550-51, 93 L. Ed.2d 514, 525-26 (1986). Even fundamental rights, such as those involving expressive exercises, are subject to limitation if a sufficiently compelling public interest exists in particular circumstances at hand. See, e.g., Eu, supra, 489 U.S. at 222, 233, 109 S.Ct. at 1019, 1025, 103 L.Ed.2d at 281, 288-89. Where a limitation on protected expressive interests emanates from a provision regarding elections, the test for compelling public interest is whether the "regulation ... is necessary to the integrity of the electoral process." Id. at 232, 109 S.Ct. at 1025, 103 L.Ed.2d at 288. This is not a standard to be lightly applied. No expressive right should be subject to restriction on anything but a directly implicated, profoundly important public interest.
In a situation such as the case at hand, we must respect the discretionary role of the county clerks, with their duties qualified by legislatively established standards. The matter before us appears to be a special situation because of the number of candidates and limitations that may exist by reason of the physical dimensions of the ballot. The integrity and fairness of the electoral process is the primary principle to be advanced in all such matters; and equality of treatment among candidates for the same office is a linchpin of that idea. The governing standard set out in the first sentence of N.J.S.A. 19:23-26.1 serves that end, and must be effected by the county clerks to the greatest extent possible. Several possibilities occur to us as available means, such as reorganizing the ballot or using typeface sizes that permit greater use of the space available. It is the county clerks who are best equipped *1099 to make these judgments in the first instance.
We, of course, recognize the breadth of the constitutionally-based principles articulated and applied in Eu. The First Amendment protects the free speech and associational rights of every candidate in a primary election to declare a ballot affiliation with any other candidate or cause, or to designate his or her choice not to affiliate. Thus, the absolute prohibition contained in the last sentence of N.J.S.A. 19:23-26.1 must be seen as a violation of the Eu standard. Yet, there is nothing inherent in the first sentence of the statute that conflicts with the overriding principle of Eu; and there can be no rights violation where a county clerk makes a fair effort to follow the dictate that all candidates for the highest office, i.e., U.S. Senator or Governor, be treated equally to the extent physical constraints allow, as long as, at the same time, a good faith effort is made to effect the expressive rights of all candidates. There can be no higher or more compelling interest in a democratic society than assuring the fairness and integrity of the election process. Well-considered choices serving that end are sustainable as long as every decent effort has been made to give the fullest possible effect to the free speech and associational rights protected by the First Amendment.
As aptly outlined in the trial court's opinion, if the bracketing required by Eu as a matter of constitutional imperative occurs in the manner in which those standards have been lately administered, the physical dimensions of the ballot machines used will give certain candidates, by the "luck of the draw" and the fact they are bracketed with candidates for other office, a more substantial advantage in ballot position than any decent notion of even treatment allows. The names of other, non-bracketed, candidates will be shunted off to obscure columns on the ballot. As the trial court judge observed, "the fifth, sixth and seventh candidates drawn [will] share the fifth and last column." In a more typical election, with a smaller number of candidates for the top position on the ballot, the idea of bracketing imposes no disadvantage on any except for the consequences of "the luck of the draw." There is, normally, enough space on the ballot to give each candidate the same relative positioning once the order of listing is determined by lot.
Of course, the very notion of drawing for ballot position suggests that some candidates will have an advantage over others. Yet, that inequality seems inherent in the nature of the situation; we can discern no way of remedying the type of inequality that comes from "the luck of the draw." We believe it to be necessary, however, to serve the compelling public interest in the integrity of the electoral process, in a situation such as the current Republican primary for Governor presents, that we mandate an approach which requires all the candidates to begin from the same position, subject to the customary drawing as to relative placement, without so extraneous a consideration as bracketing or non-bracketing as the beginning point, notwithstanding that the right to bracketing is, as a general matter, fundamental as an expressive exercise.
For these reasons we reject the breadth of the trial court decision in Lautenberg, and the Attorney General's opinion to the same effect, to the extent they regard the equality-of-treatment principle in the first sentence of N.J.S.A. 19:23-26.1 to be necessarily violative of the informing standard of Eu. We leave it to the county *1100 clerks to develop the means of giving maximum effect to both the equality-of-treatment principle and the expressive interests protected, with equality of treatment as the starting point.
We do not require any particular method of ballot construction. That is beyond our expertise. We are content to rely on the good faith and experienced wisdom of the county clerks to devise an approach to ballot positioning that treats each of the seven candidates for the Republican gubernatorial nominationas N.J.S.A. 19:23-26.1 requiresfairly and equally to the greatest extent practically possible. The structure developed will, of course, as always, be subject to judicial review for fairness, equal treatment, and fidelity to the equally compelling principle of maximizing the opportunities for voter choice in a seven-person field. But, judicial officers on any such review should not substitute their judgment for the reasonable decisions of the public officers in whom the Legislature has reposed the authority and duty to administer the electoral process with fidelity to the requirements of law, constitutional principle, and in the public interest.
The trial court's order is vacated and the matter is remanded to the county clerks for new drawings for ballot positions for the office of governor in the 2005 Republican primary.